1

2

3

4

5

6

7           **UNITED STATES DISTRICT COURT**

8      **FOR THE WESTERN DISTRICT OF WASHINGTON**

9

| | |
|---|---|
| 10 MEHRIT TESHOME, ROCCO VOLKER, JAMES VERT, and 10.23 BUILD, LLC | Case No. _____ |
| 11 Plaintiffs, | **COMPLAINT** |
| 12 v. | |
| 13 CITY OF SEATTLE, WASHINGTON, a municipal corporation | |
| 14 Defendant. | |
| 15 | |

16      1.    This civil-rights lawsuit challenges provisions of the city of Seattle (the "City" or

17  "Seattle")'s ordinance implementing what it calls the Mandatory Housing Affordability program

18  ("the MHA program" or "MHA") to residential developments. Specifically, Plaintiffs challenge

19  MHA-R,[1] which conditions permits for constructing new residential housing on either making a

20  cash payment to the City (to be deposited in the City's public housing fund) or agreeing to

21  construct and provide "affordable housing" units for up to seventy-five years.

22      2.    The City did not design MHA-R to mitigate any project's public impact. Instead,

23  The City has designed MHA-R to capture for itself part of the economic value of upzoning.[2]

24  _____

25  [1] A different permit condition, MHA-C, applies to commercial development.
    [2] This complaint uses "upzoning" to describe changes in land-use regulations designed to allow

26  greater residential development—*e.g.*, when the City changes a single-family zone to a low-rise
    residential zone, allowing for townhouse apartment development in addition to standalone

27  single-unit structures.

28  **COMPLAINT** - 1

1  MHA-R applies only within zones that the City has upzoned within the last several years (or will

2  upzone in the future), and MHA-R's demand schedule increases according to the size of each

3  upzoning, using the City's estimate of that upzoning's market value as of 2019. Thus, the City

4  has upzoned areas of Seattle while simultaneously forcing land-use permittees to pay for that

5  upzoning, regardless of whether their project uses the upzoning or not. This has nothing to do

6  with addressing or mitigating the effect of the project on the public.

7       3.     The U.S. Constitution, however, requires that land-use permit conditions be

8  tailored to mitigate the public effects or impacts of the project. The *Nollan-Dolan* tests (named

9  after Supreme Court cases) are a special application of the Court's unconstitutional-conditions

10  doctrine that protects the right guaranteed by the Fifth and Fourteenth Amendments' guarantee

11  that the government may not take property without paying just compensation. To prevent abuse

12  of the permitting process—out-and-out extortion—the *Nollan-Dolan* tests require the

13  *government* to show that its land-use permit conditions bear both (1) an "essential nexus" and (2)

14  a "rough proportionality" to a project's public impact. Permit conditions that fail either part of

15  *Nollan-Dolan* fail the unconstitutional conditions doctrine for burdening the right not to have

16  property taken without just compensation. Just last year, the Supreme Court held that these tests

17  apply to generally applicable land-use conditions set by legislatures. *Sheetz v. County of El*

18  *Dorado*, 601 U.S. 267 (2024). Thus, the City may not leverage its land-use permitting authority

19  to take advantage of people, merely because they wish to build on their own property.

20       4.     MHA-R's enforcement in all cases—and certainly as applied to Plaintiffs—fails

21  both *Nollan-Dolan* tests.

22       5.     First, it can never share an "essential nexus" with impact mitigation. An "essential

23  nexus" means that the development triggering the permit condition "would substantially impede"

24  the same land-use interest that is furthered by the permit condition. MHA-R conditions apply to

25  all people wishing to add to Seattle's housing supply (within an MHA zone), and the City has

26  stated that MHA-R furthers the City's interest in helping low-income people access housing in

27  Seattle. Therefore, for MHA-R to satisfy the "essential nexus" test, the City must show that

28  **COMPLAINT** - 2

adding to Seattle's housing supply "would substantially impede" a low-income person from accessing housing in Seattle. It cannot do that because—as the City has admitted—additional housing of all kinds results in lower housing costs generally. Indeed, that is why the City upzoned areas of Seattle: because more housing would help people better afford housing. It cannot also be the case that additional housing, in the very areas that the City has identified need it the most, "would substantially impede" any low-income person from accessing housing. Therefore, MHA-R is unconstitutional both on its face and as applied.

6.    Second, MHA-R's demand never reflects a "rough proportionality" to a project's public impact. Even if a land-use condition is essentially related to impact mitigation, it must also be tailored to demand no more than is necessary to mitigate the public harm resulting from the new development. Because MHA-R can never be essentially related to impact mitigation, a "proportional" demand here would be $0 in all cases. But even if additional housing could somehow (paradoxically) impede a low-income person from accessing housing, MHA-R's demand schedule does not reflect any such impediment. Instead, it reflects the City's years-old estimate of the economic value of upzoning. These amounts, as applied to any project, are arbitrary in relation to impact mitigation. Therefore, MHA-R is unconstitutional both on its face and as applied for this reason as well.

7.    Plaintiffs Mehrit Teshome and her husband Rocco Volker (the "Volkers") are longtime Seattle homeowners who, approaching retirement, wish to downsize their single-family house. Although the new house would be smaller in size than their current house, City regulations classify it as a "duplex"—*i.e.*, they will technically be adding a dwelling unit to Seattle's housing supply. Because the Volkers' house is in an MHA zone and their project would add a housing unit to Seattle, they could not obtain a build permit without satisfying the MHA-R condition. Doing so required that they either (1) agree to provide two dwelling units as "affordable housing" rentals for 75 years, replacing any vacancy that may occur during that period, or (2) pay the City $36,432.38 in "affordable housing" MHA-R fees. Accordingly, in

**COMPLAINT** - 3

INSTITUTE FOR JUSTICE
600 University Street, Suite 2710
Seattle, WA 98101
Tel: (206) 957-1300

March 2024, the Volkers paid the City $36,432.38 in "affordable housing" fees—in addition to other permitting fees—in exchange for their permit.

8.    Plaintiff James Vert owns a small construction company, Plaintiff 10.23 Build, LLC. For twenty years, Mr. Vert has specialized in small-scale projects in Seattle (the largest project so far has seven units). His latest project is a four-unit townhouse development. Because that project adds housing to Seattle, he could not obtain a build permit without satisfying the MHA-R condition. Doing so required that he either (1) agree to provide two dwelling units as "affordable housing" rentals for 75 years, replacing any vacancy that may occur during that period, or (2) pay the City $124,093.19 in "affordable housing" MHA-R fees. Accordingly, in March 2024, Mr. Vert (via 10.23 Build, LLC) paid the City $124,093.19 in MHA-R fees—in addition to other permitting fees—in exchange for his permit.

9.    None of the Plaintiffs' projects, nor any other project to which MHA-R applies, would substantially impede any low-income person from accessing housing. Therefore, MHA-R's demand did not share an "essential nexus" with their projects' public impacts, nor will it share an "essential nexus" with their future projects' public impacts, or with any other project's public impacts.

10.    Moreover, MHA-R, as applied to the Plaintiffs' projects, as well as any other project, does not measure a project's impact on the government's asserted land-use interest but, instead, measures the City's years-old estimated value of upzoning in the project's area. Therefore, MHA-R's demand did not reflect a "rough proportionality" to their projects' public impacts, nor will it reflect a "rough proportionality" to their future projects' public impacts, or to any other project's impacts, even if additional housing supply could (paradoxically) substantially impact a low-income person's ability to access housing.

11.    Because MHA-R permit conditions, both on their face and as applied to Plaintiffs, fail *Nollan-Dolan*, Plaintiffs are entitled to damages reflecting MHA-R fees they have already paid; to a declaration that MHA-R's enforcement as-applied and on its face violates the

**COMPLAINT** - 4

Constitution; to an injunction preventing MHA-R's enforcement; and to any other relief this Court may find proper.

## JURISDICTION AND VENUE

12.    Plaintiffs bring this civil-rights lawsuit under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the incorporated and self-executing Fifth Amendment to the U.S. Constitution; and the Declaratory Judgments Act, 28 U.S.C. §§ 2201–02.

13.    Plaintiffs seek (i) damages in the amount of MHA-R fees each has already paid, (ii) a declaration that the City's enforcement of Seattle Municipal Code ("SMC") §§ 23.58C.005–.055, on its face and as applied to Plaintiffs, violates the Fifth and Fourteenth Amendment of the United States Constitution, and (iii) an injunction against continued application of MHA-R.

14.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

15.    Venue lies in this Court under 28 U.S.C. § 1391(b)(1)–(2).

## THE PARTIES

16.    Plaintiffs Mehrit Teshome, Rocco Volker, and James Vert are citizens of the United States and are residents of the City of Seattle, Washington. Plaintiff 10.23 Build, LLC is an entity incorporated in the state of Washington.

17.    Defendant City of Seattle is a municipal corporation located in King County, Washington.

## FACTUAL ALLEGATIONS

**A.    RECOGNIZING THAT SEATTLE HAS A HOUSING SHORTAGE, THE CITY UPZONES PARTS OF SEATTLE.**

18.    Seattle, like many cities across the country, is currently experiencing a housing shortage.

19.    There is currently a high housing demand in Seattle, and new housing would help accommodate that demand.

**COMPLAINT** - 5

INSTITUTE FOR JUSTICE
600 University Street, Suite 2710
Seattle, WA 98101
Tel: (206) 957-1300

20.      Additional housing supply of all kinds is a way of addressing this housing shortage, *i.e.*, of moderating Seattle's housing demand.

21.      Increased residential capacity and housing supply, *i.e.* upzoning, is likely to reduce upward pressure on market-rate housing costs.

22.      The City recognizes this and, accordingly, it has boosted housing market capacity through upzones.

23.      Through these upzones, the City's goal is to add at least 30,000 units of market-rate housing to Seattle over ten years.

24.      By increasing Seattle's supply of market-rate housing, the City hopes to reduce the cost of housing in Seattle—both in terms of rents and costs of homeownership.

25.      Accordingly, additional housing supply in Seattle does not make it more difficult for anyone to afford housing in Seattle.

**B.      THE CITY PASSES MHA IN AN ATTEMPT TO CAPTURE FOR ITSELF THE VALUE OF THOSE UPZONINGS.**

26.      In July 2015, the Seattle Mayor's Office released a "Statement of Intent for Basic Framework for Mandatory Housing." The City itself referred to this statement as a "Grand Bargain" between the City and "major players," meaning representatives of various interest groups. *See* Grand Bargain Memorandum, July 13, 2015, https://www.seattle.gov/Documents/ Departments/HALA/HALA%20Grand%20Bargain.pdf.

27.      As part of the "Grand Bargain," the City stated that it would upzone areas of Seattle and, at the same time, it would require that developers in those zones agree to provide "affordable housing" (*i.e.*, below-market rental or sale units), or pay in-lieu fees, as a condition of any permit to construct housing in those zones.

28.      The "Grand Bargain" specified that the new program would calculate the requisite amount of "affordable housing" and in-lieu fees to capture "the value of this available increment [*i.e.*, of the additional density/height allotment, which] would be paid towards affordable housing whether or not the increment was used."

COMPLAINT - 6

29.     The "Grand Bargain" included "[c]ommitment from 'major players' to not pursue legal action [against] Mandatory Inclusionary Housing."

30.     By "major players," the City meant the signatories to the "Grand Bargain"—*i.e.*, large developer associations, nonprofit and other activist groups, and community organizations.

31.     The City's goal in pursuing the Grand Bargain was to secure support from these "major players" not to challenge MHA in court.

32.     On the same day that it signed its "Grand Bargain," the mayor and City Council (through an appointed committee) released a report outlining the proposed MHA program. *See* Final Advisory Comm. Recommendations to Mayor Edward B. Murray and the Seattle City Council, July 13, 2015 ("HALA Report"), https://www.seattle.gov/documents/departments/hala/policy/hala_report_2015.pdf.

33.     That report, in accordance with the City's "Grand Bargain" with "major players," stated that the City would upzone areas across Seattle and, in exchange, the City would demand an "[a]mount of affordable housing required (and in-lieu fees) [] based on value of upzones." HALA Report, Appendix E.

34.     In March 2019, the Seattle City Council adopted Ordinance 125791, which implemented the proposed MHA in various zones across Seattle.

35.     Local news reports readily noted that the amount of MHA's affordable-housing and in-lieu fee requirement was "in exchange for [] increased density." *See, e.g.*, Josh Cohen, *Council Approves a Taller Denser Seattle. What Does That Mean for Housing?*, Cascade PBS (Mar. 18, 2019), https://www.cascadepbs.org/growth/2019/03/council-approves-taller-denser-seattle-what-does-mean-housing/.

36.     MHA applies only within zones that have been upzoned within the last several years. That is, whenever an area is upzoned (since MHA's passage), that area becomes an "MHA" zone wherein MHA permit conditions apply.

37.     Within MHA zones, residential development is subject to the MHA-R permit condition (the subject of this case).

**COMPLAINT** - 7

38.     The MHA-R permit condition applies to anyone wishing to add one or more housing units within an MHA zone. *See* Seattle Municipal Code ("SMC") § 23.34.006. *See also* SMC § 23.58C.025(B).

39.     To satisfy the MHA-R permit condition, residential developers must agree to either a "performance option" or a "payment option." SMC § 23.58C.025(A).

40.     The "performance option" requires that the developer agree to provide a certain number of "affordable housing" (or "MHA-R") rental units, with affirmative obligations lasting up to seventy-five years. *See* SMC § 23.58C.050(A)–(B).

41.     The amount of new MHA-R units required to satisfy the "performance option" is calculated by multiplying the proposed development's total number of units by a fraction that the City has assigned to each zone. SMC § 23.58C.050.

42.     For any development subject to MHA-R, no matter how small its size, satisfying MHA-R "performance" requires providing at least two MHA-R units (or one three-bedroom unit). SMC § 23.58C.050(A)(2).

43.     The seventy-five-year affirmative obligations imposed by the performance option include:

(a) The owner must open the MHA-R unit(s) to eligible low-income tenants. SMC 23.58C.050(B)(1).

(b) The owner must "inform and solicit applications from [eligible] households," *i.e.* enter into a new lease, whenever there is a vacancy in an MHA-R unit, for up to seventy-five years. SMC 23.58C.050(C)(4).

(c) The owner must provide a "substitute" MHA-R unit, and likewise open it up to eligible tenants, whenever any MHA-R tenant's income exceeds a certain threshold, for up to seventy-five years. SMC 23.58C.050(C)(4), (6)(f).

44.     In other words, MHA-R "performance" is not a mere cap on rent that may be charged, should the owner ever decide to rent the MHA-R unit(s). MHA-R requires those units to be rented out—they cannot be left vacant—for the seventy-five-year period. Those units

**COMPLAINT** - 8

cannot be left vacant or put to the owner's own uses. *See also* https://www.seattle.gov/documents/departments/opcd/seattleplan/mha5yearevaluationberk2025.pdf, at 13–14 (setting out required elements of performance option).

45.    Alternatively, the City may allow permittees to satisfy MHA-R "performance" by selling the MHA-R units (at capped amounts, to eligible buyers).

46.    In lieu of "performance," permittees may elect to provide MHA-R "payment," which requires that the permittee "provide a cash contribution to the City," to be deposited into the City's public housing fund. *See* SMC § 23.58C.040(A)(1).

47.    The amount of cash payment required to satisfy MHA's "payment option" is calculated by multiplying the square footage of the proposed development's gross floor area by a dollar amount that the City has assigned to each zone. SMC § 23.58C.040(A).

48.    The amount of both MHA-R's "performance" and "payment" demanded primarily reflects (1) the extent of upzoning in each zone and (2) the City's years-old estimate of that upzoning's market value.

49.    As the City noted, the "[a]mount of affordable housing required (and in-lieu fees) is based on value of upzones, and varies by market and construction type." HALA Report, Appendix E.

50.    In other words, MHA-R's performance and payment obligations are "tiered," depending on the amount of upzoning—and zones that have received greater upzoning impose greater MHA-R requirements.

51.    In the City's words, its goal in setting MHA-R's demand schedule was "to ensure that the development capacity provided through that upzoning could support the costs MHA-R imposes on developers."

**COMPLAINT** - 9

52.     Therefore, by the City's own admission, the City did not design MHA-R's demand schedules to reflect the amount of any given project's impact, if any, on its land-use interest.[3]

53.     Each subsequent time that the City increases a zone's density/height allotment, that zone's MHA-R demand schedule increases. *See* SMC § 23.34.006.

54.     For example, in a "medium" tier zone with an (M) suffix (which includes Plaintiffs' zones), a house's MHA-R "payment" obligation would be roughly $20 per square foot of the house's floorspace. Were the City to upzone that zone, the zone's MHA suffix would change to (M1), and the MHA-R "payment" obligation for *precisely the same house* would be roughly $30 per square foot. *See* https://www.seattle.gov/sdci/codes/codes-we-enforce-(a-z)/mandatory-housing-affordability-(mha)-program (Table 4).

55.     The MHA-R condition increases the cost of constructing a home, discouraging people from adding housing in the very areas of Seattle where the City has identified the most need for housing.

56.     The City knew that this would happen before it passed MHA.

57.     In 2016, the City commissioned a technical report to "evaluate[] the economic viability of new development with the zoning changes and proposed payment or performance requirements associated with MHA." HALA Economic Analysis Summary Memorandum, Nov. 29, 2016 ("HALA Economic Analysis"), https://www.seattle.gov/documents/Departments/HALA/Policy/2016_1129%20CAI%20HALA%20Economic%20Analysis%20Summary%20Memorandum.pdf, at 1.

---

[3] Because the amount of MHA-R obligation was set according to the City's estimate of the market value of upzoning as of 2019, that amount never reflected a project's actual impact, if any, on the City's land-use interest. Exacerbating this problem, the City's recent evaluation report of MHA admits that the "value of the upzones . . . do not hold up over time" such that upzoning does not even support the MHA-R costs imposed. https://www.seattle.gov/documents/Departments/OPCD/SeattlePlan/MHAMayorLetterToCouncil.pdf .

**COMPLAINT** - 10

INSTITUTE FOR JUSTICE
600 University Street, Suite 2710
Seattle, WA 98101
Tel: (206) 957-1300

58.     That report predicted that "[i]ncreased developer costs will have the effect of reducing developer interest or increasing rents for market-rate units."

59.     A more recent NYU study confirmed that MHA-R's increased costs have the effect of routing development away from MHA zones, toward non-MHA zones (*i.e.*, zones that the City has not upzoned). Jacob Krimmel & Betty Wang, *Upzoning with Strings Attached: Evidence from Seattle's Affordable Housing Mandate*, N.Y.U. Furman Center (2023), https://furmancenter.org/files/publications/Upzoning_with_Strings_Attached_508.pdf.

60.     Most recently, the City's evaluation of MHA admits that MHA-R has negatively affected development throughout Seattle due to compliance costs, particularly for the kinds of small projects that Plaintiffs built and will build. Confirming the NYU study, the City's own study found that MHA's costs shift development away from MHA zones to non-MHA zones. https://www.seattle.gov/documents/departments/opcd/seattleplan/mha5yearevaluationberk2025.pdf.

61.     Thus, by enforcing the MHA-R permit condition, the City is making it more expensive for Plaintiffs and others to add housing to Seattle—during an ongoing housing shortage, within the very zones that the City has identified as particularly needing more housing supply.

62.     Nevertheless, the City claims that MHA-R furthers its interest in assisting low-income people with accessing housing in Seattle.

**C.     THE CITY FORCED PLAINTIFFS TO SATISFY THE MHA-R CONDITION, IN EXCHANGE FOR A PERMIT TO ADD HOUSING TO SEATTLE.**

### *Plaintiffs Rocco Volker and Mehrit Teshome*

63.     Plaintiffs Mehrit Teshome and Rocco Volker ("the Volkers") are a married couple who have lived in Seattle for decades.

64.     In 2008, the Volkers purchased the home located at 1719 Bradner Place South, Seattle, Washington 98144, where they still currently live.

**COMPLAINT** - 11

65.    The Volkers' home is located in an MHA zone, meaning that MHA-R permit obligations apply to virtually any development that would add a housing unit to the zone.

66.    The Volkers' home sits across three parcels, and it includes 4,650 square feet of floor space and four bedrooms.

67.    That is more space than the Volkers need, particularly as they approach retirement. Therefore, in 2020, they decided that they would downsize their home by demolishing it and rebuilding a smaller structure in its place.

68.    Moreover, the Volkers decided that the new, smaller structure would be built on only one of their three parcels—allowing the Volkers to build additional homes on the second and third parcels.

69.    The Volkers had wished for the new, smaller structure to include six bedrooms and 3,365 square feet of floor space—which would include an attached accessory dwelling unit.

70.    However, the City's zoning does not allow for the Volkers' desired project to be classified as a single dwelling unit with an attached accessory dwelling unit.

71.    The City's zoning allows the Volkers' desired project only if it is classified as a duplex—*i.e.*, if their desired "accessory dwelling unit" were deemed its own independent "dwelling unit" rather than "accessory" to another dwelling unit.

72.    Accordingly, a City officer suggested that the Volkers instead seek a permit to build a "duplex."

73.    The Volkers hired an architect who drew up plans for the new structure and began the permitting process with the City.

74.    During the permitting process, a City officer informed the Volkers' architect that their permit was subject to MHA-R requirements, in addition to other permitting obligations.

75.    The Volkers' project triggered MHA-R permit requirements because, even though their new home would be smaller than their current one, the City labeled it a "duplex" and thus classified the Volkers project as adding a new dwelling unit to Seattle (within an MHA zone).

**COMPLAINT** - 12

76.     The Volkers wish to use both units in their "duplex" themselves (and occasional visiting friends and family).

77.     To satisfy the MHA-R permit condition, the Volkers had to either (1) agree to provide MHA-R "performance" or (2) provide the City MHA-R "payment."

78.     To satisfy MHA-R "performance" and still have use of their desired two-unit project, the Volkers would have had to agree to build and provide two *additional* dwelling units (or one three-bedroom unit) as affordable-housing rental units, either on-site or somewhere else in Seattle, for up to 75 years.

79.     That would require the Volkers to enter into leases with eligible MHA-R tenants, for up to 75 years.

80.     That would also require that, on any vacancy in the MHA-R units, the Volkers enter into another lease with another eligible MHA-R tenant, for up to 75 years.

81.     That would also require that, if any MHA-R tenant's income were to exceed a certain threshold, the Volkers build a substitute MHA-R unit, then open that unit up to another MHA-R tenant, for up to 75 years.

82.     The Volkers would have had no option to allow an MHA-R unit to remain vacant.

83.     The Volkers would have had no option to themselves live within one of the MHA-R units.

84.     Alternatively, instead of providing affordable-housing rental units, the Volkers could have satisfied MHA-R "performance" by agreeing to construct two dwelling units (or one three-bedroom unit) and sell them at capped amounts, to eligible MHA-R buyers.

85.     The Volkers do not wish to construct extra dwelling units, beyond their desired "duplex," and operate them as low-income rental units.

86.     The Volkers do not wish to construct extra dwelling units, beyond their desired "duplex," and sell them at capped amounts.

87.     The Volkers do not wish to sell either (or both) of the units in their desired "duplex."

**COMPLAINT** - 13

INSTITUTE FOR JUSTICE
600 University Street, Suite 2710
Seattle, WA 98101
Tel: (206) 957-1300

88.     Therefore, the Volkers decided to provide the City MHA-R "payment," instead of "performance."

89.     A City officer confirmed that the Volkers' MHA-R "payment" obligation would be $36,432.28, an amount the Volkers were required to pay before their permit would be issued.

90.     The Volkers paid that amount and, on March 18, 2024, the City acknowledged receipt.

91.     On March 20, 2024, the City cashed the Volkers' check representing their MHA-R payment.

92.     Subsequently, the City issued the Volkers a permit to construct their project.

93.     At that time, the Volkers did not know that the City was willing to consider requests to waive MHA-R due to "severe economic impact." Hence, they did not request such a waiver.

94.     Months later, the Volkers learned for the first time that MHA-R has a provision allowing applications to waive MHA-R due to "severe economic impact."

95.     The Volkers contacted the Seattle Department of Construction and Inspections ("SDCI") to ask whether they could submit an MHA-R waiver request.

96.     On November 18, 2024, an SDCI officer sent an e-mail to the Volkers explaining that he had "consulted with our team" and that "a case for a severe economic impact has to be done as part of the original building permit review. That means a special exception would have had to have been requested during that building permit review, prior to MHA payment and building permit issuance. The only way to return the MHA fees on this project now would be if the permit were fully withdrawn."

97.     In other words, it is too late for the Volkers to request that MHA-R obligations be waived for the permit that they have received.

98.     The Volkers do not wish to fully withdraw their permit for a variety of reasons. Doing so would delay their ability to start their project and require that they pay their architect further fees. Moreover, it is not certain that a new permit application would be granted. These are

**COMPLAINT** - 14

real costs that the Volkers would have to bear, whereas the likelihood that they would receive an MHA-R waiver is very low.

99.    The Volkers are securing financing to construct their project and plan on breaking ground by the end of this year.

100.    Once the Volkers' project is completed, their second and third parcels will be vacant and will be able to support additional residential development.

101.    Immediately after their project is completed, the Volkers would like to begin developing additional homes on their second and third parcels.

102.    The Volkers' second and third parcels are within an MHA zone and, therefore, their use is subject to the MHA-R permit condition.

103.    The Volkers would prefer to build on their second and third parcel themselves, but they will not do so if they must again satisfy MHA-R obligations (*i.e.*, pay MHA-R fees). Instead, if their parcels remain subject to the MHA-R permit condition, the Volkers will sell their parcels.

104.    But for the City's enforcement of its MHA-R permit condition, the Volkers would not sell their parcels.

### Plaintiffs James Vert and 10.23 Build, LLC

105.    Plaintiff James Vert is a lifelong resident of Seattle, and, for twenty years, he has worked as a residential developer.

106.    Plaintiff 10.23 Build, LLC is a business entity through which Mr. Vert currently operates. 10.23 Build, LLC is entirely owned by a parent LLC, which in turn is entirely owned by Mr. Vert and his wife. Mr. Vert has sole authority to bind 10.23 Build, LLC.[4]

107.    Mr. Vert specializes in small residential projects—many have been single-family homes, while the largest has been a seven-unit structure.

---

[4] For brevity's sake, this Complaint refers to Plaintiffs Vert and 10.23 Build, LLC collectively as "Mr. Vert," except when relevant to distinguish between the two.

**COMPLAINT** - 15

108. The last few years have been financially difficult for the Vert family because James was diagnosed with blood-vessel cancer. Thankfully, his cancer is in remission, but the ordeal has depleted his family's savings.

109. Meanwhile, MHA-R has added substantial costs to Mr. Vert's projects.

110. For example, in 2021, Mr. Vert (operating under a different LLC) was required to pay the MHA-R fee for two different projects.

111. Mr. Vert's most recent project is a four-unit townhouse, currently under construction, at 4113 Chilberg Avenue Southwest, Seattle, Washington 98116.

112. Those four units' respective sizes range from roughly 1,500 to 2,000 square feet of floor space, as well as one 224-square-foot garage.

113. During the permitting process for that project, the City informed Mr. Vert that he would have to satisfy MHA-R obligations before receiving a permit—because he is adding housing units to Seattle within an MHA zone.

114. To satisfy MHA-R "performance," Mr. Vert would have had to agree to provide two units (or one three-bedroom unit) as affordable-housing rentals for up to 75 years.

115. The City would have encumbered two of Mr. Vert's four units as MHA-R units.

116. Alternatively, the City would have required Mr. Vert to construct and provide MHA-R units off-site if Mr. Vert wanted his four-unit townhouse itself to be unencumbered by MHA-R deed restrictions.

117. Either way, MHA-R "performance" would have required Mr. Vert to enter into leases with eligible MHA-R tenants, for up to 75 years.

118. Moreover, upon any vacancy in the MHA-R units, Mr. Vert would have been required to enter into another lease with another eligible MHA-R tenant, for up to 75 years.

119. Moreover, if any MHA-R tenant's income were to exceed a certain threshold, Mr. Vert would have been required to provide a substitute MHA-R unit, then open that unit up to another MHA-R tenant, for up to 75 years.

120. Mr. Vert would have had no option to allow an MHA-R unit to remain vacant.

**COMPLAINT** - 16

121.    Mr. Vert would have had no option to himself live within one of the MHA-R units.

122.    Alternatively, instead of providing affordable-housing rental units, Mr. Vert could have satisfied MHA-R "performance" by agreeing to construct two dwelling units (or one three-bedroom unit)—either two of his four units or two off-site units—and sell them at capped amounts, to eligible MHA-R buyers.

123.    Although Mr. Vert would like the option of renting out the units in his new townhouse (or selling them to someone who would), he did not wish to agree to a deed restriction requiring that units be continually rented out, or be rented out at capped amounts.

124.    Although Mr. Vert would like the option of selling his new townhouse, he did not wish to agree to sell any of them at capped amounts.

125.    Likewise, Mr. Vert did not wish to agree to construct dwelling units off-site and sell them at capped amounts.

126.    Likewise, Mr. Vert did not wish to agree to construct dwelling units off-site and operate them as low-income rentals, for 75 years.

127.    Therefore, Mr. Vert decided to provide the City MHA-R "payment," instead of "performance."

128.    A City officer confirmed that Mr. Vert's MHA-R "payment" obligation would be $124,093.19, an amount that Mr. Vert was required to pay before his permit would be issued.

129.    Mr. Vert (via Plaintiff 10.23 Build, LLC) paid that amount. However, he did not think it fair that he should have to satisfy any MHA-R obligations. Accordingly, Mr. Vert wrote "paid under protest" on the check that he provided to the City.

130.    On March 5, 2025, the City acknowledged receipt, but it did not acknowledge Mr. Vert's statement that he paid under protest.

131.    On March 6, 2025, the City cashed Mr. Vert's check representing his MHA-R payment.

132.    Subsequently, the City issued Mr. Vert a permit to construct his townhouse.

**COMPLAINT** - 17

133.    It is too late for Mr. Vert to seek an MHA-R waiver for his project without fully withdrawing his permit.

134.    In fact, Mr. Vert cannot withdraw his permit and resubmit a permit application with a waiver request because he has already broken ground on his project.

135.    Even if he could, Mr. Vert does not wish to withdraw his permit for a variety of reasons. Doing so would delay his ability to complete the project and require that he pay further fees. Moreover, it is not certain that a new permit application would be granted. These are real costs that Mr. Vert would have to bear, whereas the likelihood that he would receive an MHA-R waiver is very low.

136.    Mr. Vert's standard practice is to search for a new parcel in Seattle to purchase and develop, while his current building project is underway.

137.    Accordingly, Mr. Vert has begun searching for a new parcel in Seattle to purchase and develop.

138.    Mr. Vert has previously purchased and developed projects in zones across Seattle, without regard to whether the project's zone has been upzoned.

139.    Now, Mr. Vert's calculus in deciding whether to purchase and develop a given parcel includes whether it is located within an MHA zone. Due to MHA-R's increased and upfront costs, Mr. Vert is more hesitant to purchase and develop a parcel if its use is subject to MHA-R.

140.    On multiple occasions, Mr. Vert has already chosen not to purchase and develop a parcel because that parcel is located in an MHA zone.

141.    Mr. Vert is not alone; Seattle developers, particularly small ones, are avoiding MHA zones.

142.    But for MHA-R, Mr. Vert would purchase and develop parcels regardless of whether the parcel's location has been upzoned.

**COMPLAINT** - 18

143.    Even though MHA-R makes it less likely that Mr. Vert will pursue a project within an MHA-R zone, he does not believe his business can successfully continue if he avoids all projects within MHA-R zones.

144.    Therefore, it is likely that Mr. Vert will again be subject to MHA-R in the future. Indeed, Mr. Vert has already been required to pay MHA-R obligations on three occasions.

145.    Mr. Vert does not wish to again be subject to the MHA-R condition.

**D.    EVEN IF PLAINTIFFS COULD APPLY FOR A WAIVER, THAT PROCESS WOULD BE UNAVAILING.**

146.    The City allows residential developers to request that MHA-R be waived due to "severe economic impact."

147.    The City allows people seeking a permit for commercial development to seek a waiver of MHA-C obligations "based on mitigation greater than impact," *in addition to* allowing them to seek a waiver based on "severe economic impact." SMC § 23.58B.030(C), (D).

148.    By contrast, the City allows residential developers to seek a waiver of MHA-R obligations only based on "severe economic impact," but does not permit them to seek a waiver "based on mitigation greater than impact."

149.    The City's criteria for waiver based on "severe economic impact" places a heavy burden on the applicant.

150.    The City's standard for "severe economic impact" is also vague and lends itself to discriminatory and inconsistent application.

151.    The City has explained to the public that proving waiver based on "severe economic impact" places a heavy burden on the applicant.

152.    Specifically, the waiver applicant must show either that MHA-R's enforcement prevents all beneficial use of the parcel, or that it would be an "undue burden" based on a variety of factors relating to the applicant's reasonable, investment-backed expectations. *See* SMC § 23.58C.035(C)(4).

**COMPLAINT** - 19

153. In determining whether MHA-R's enforcement would work an "undue burden" constituting a "severe economic impact" warranting waiver, the City does not consider whether MHA-R's enforcement represents impact mitigation. For example, the City would not grant a waiver on the basis that the proposed residential development would not substantially impede a low-income person from accessing housing.

154. If the City did waive MHA-R because the proposed residential development would not substantially impede a low-income person from accessing housing, then it would waive MHA-R in all cases.

155. The City has waived MHA-R only one time.

156. That single waiver presented exceptional circumstances: MHA-R came into effect while the permittee's application was being reviewed, and it rendered his development nonviable.

157. When the City granted that waiver request, the head of its waiver process remarked that this was not only the first but also the only MHA-R modification likely to be granted.

**INJURY TO PLAINTIFFS**

158. Plaintiffs own parcels within MHA zones, meaning that Plaintiffs' parcels are subject to the MHA-R permit condition.

159. The MHA-R permit condition requires that anyone wishing to add one or more dwelling units to their parcel agree to subsidize the City's low-income housing efforts—either through "payment" that is deposited in the City's public housing fund, or through "performance" whereby the permittee agrees to operate at least two low-income housing rental units for up to 75 years (or build and sell them at capped amounts).

160. The Volkers wish to remodel the house on their parcel in a way that would add a dwelling unit to their parcel. Therefore, the City required the Volkers to satisfy MHA-R obligations as a condition of obtaining a permit for their project.

**COMPLAINT** - 20

161.    James Vert wished to build a project that would add four dwelling units to his parcel. Therefore, the City required Mr. Vert, via 10.23 Build, LLC, to satisfy MHA-R obligations as a condition of obtaining a permit for his project.

162.    The Volkers' MHA-R "payment" obligation was $36,432.38, which they paid to the City.

163.    Mr. Vert's MHA-R "payment" obligation was $124,093.19, which he paid, via 10.23 Build, LLC, to the City.

164.    The only way that the City would return the Volkers' MHA-R payment, absent judicial intervention, would be if they withdrew their permit entirely.

165.    The City will not return Mr. Vert's MHA-R payment absent judicial intervention, as Mr. Vert has already begun constructing his project pursuant to his permit (and therefore cannot withdraw it).

166.    Thus, the City has enforced the MHA-R permit condition against Plaintiffs, who have experienced injury including the loss of funds required to provide MHA-R "payment."

167.    The Volkers will soon undertake their permitted project's development and, upon its completion, two of the three parcels on which their current house sits will be vacant.

168.    But for MHA-R's encumbrance of those vacant parcels, the Volkers would begin the process for developing those vacant parcels upon completion of their current project.

169.    MHA-R would apply to virtually any residential development on the Volkers' second or third parcel.

170.    Mr. Vert, via business entities including 10.23 Build, LLC, has purchased and developed many parcels in Seattle over the years.

171.    Three of those projects have already been subject to MHA-R permit conditions, including the project that Mr. Vert is currently building (and which cost 10.23 Build, LLC $124,093.19 in MHA-R fees).

172.    As is his standard practice, Mr. Vert is looking for a parcel to purchase and develop, while his current project is underway.

**COMPLAINT** - 21

INSTITUTE FOR JUSTICE
600 University Street, Suite 2710
Seattle, WA 98101
Tel: (206) 957-1300

173. Mr. Vert is less likely to purchase and develop a parcel if it is located in an MHA zone, because of the costs that MHA-R adds to residential projects.

174. Nevertheless, it is likely that Mr. Vert will again purchase and pursue a project that is subject to MHA-R, as he cannot sustain his business without building within MHA zones.

## DECLARATORY RELIEF ALLEGATIONS

175. An actual and substantial controversy exists between Plaintiffs and the City as to the parties' rights and responsibilities; namely, that Plaintiffs assert that MHA-R—which operates directly upon their properties, and which influences their decisions to purchase or develop additional properties—may not be enforced without violating the Fifth and Fourteenth Amendments to the U.S. Constitution.

## INJUNCTIVE RELIEF ALLEGATIONS

176. Plaintiffs have no plain, speedy, and adequate remedy at law to address the ongoing and further violation of their rights under color of state law.

177. Injunctive relief is also necessary here to prevent the City from attempting to violate the Plaintiffs' constitutional rights and harm them and their interest in their property in the future, as well as to prevent the City from harming their interests in purchasing and developing other residential housing projects in zones wherein MHA-R applies.

178. Plaintiffs have a substantial likelihood of succeeding on the merits of their claims because MHA-R's enforcement, both on its face and as applied, violates the *Nollan-Dolan* tests, *i.e.*, the Fifth and Fourteenth Amendments to the U.S. Constitution.

179. An injunction against the City will serve the public interest. An injunction will allow the Plaintiffs to develop their properties as the Constitution permits, and it will prevent the City from causing irreparable damage by causing Plaintiffs either to sell property that they would otherwise develop or to forgo purchasing property that they would otherwise develop.

180. An injunction will not prevent the City from addressing Seattle's housing crisis, nor will it prevent the City from encouraging or subsidizing the construction of low-income

**COMPLAINT** - 22

housing in Seattle. It would instead only require the City to do so in a manner consistent with the Fifth and Fourteenth Amendments to the U.S. Constitution.

## CONSTITUTIONAL VIOLATIONS
### Fifth and Fourteenth Amendments to the U.S. Constitution
**(Facial and As Applied—Unconstitutional Conditions; Taking of Private Property Without Just Compensation)**

181.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 180, inclusive.

182.    The Due Process Clause of the Fourteenth Amendment incorporates, amongst other things, the Fifth Amendment's prohibition on uncompensated takings of property or its value.

183.    In addition to guarding against outright confiscation of property, the Due Process Clause also protects owners against abusive governmental conditions on the use of their property.

184.    The *Nollan-Dolan* doctrine (named after two Supreme Court cases) establishes two tests that land-use conditions must satisfy, lest their enforcement be equivalent to the uncompensated taking of property or its value or impermissibly burden the right not to have property taken without just compensation.

185.    Specifically, government bears the burden of showing that its land-use condition shares both an "essential nexus" with, and "rough proportionality" to, mitigating the negative public impact of the conditional property use.

186.    If government cannot show that its land-use condition satisfies both tests, then its enforcement of that condition amounts to an unconstitutional condition or unconstitutional *per se* taking of property or its value.

187.    The City, acting under color of law, enforced MHA-R—a land-use permit condition—against Plaintiffs.

188.    The City bears the burden of demonstrating that MHA-R's enforcement shares an essential nexus with, and a rough proportionality to, the anticipated negative public impact (or costs) of the project to which it applies.

**COMPLAINT** - 23

189.    By "essential nexus," the City must demonstrate that the project to which MHA-R applies "would substantially impede" the same legitimate interest served by the MHA-R condition.

190.    MHA-R applies to anyone wishing to add housing to Seattle (within an MHA zone, *i.e.*, a zone the City has upzoned), and, in the City's telling, MHA-R furthers its interest in helping low-income people access housing in Seattle.

191.    Therefore, for MHA-R to share an "essential nexus" with impact mitigation, the City must demonstrate that adding housing to Seattle (within the very zones it has identified as most in need of housing) "would substantially impede" a low-income person from accessing housing in Seattle.

192.    The only nexus the City has ever claimed is that "spending from the project's residents would generate local demand for goods and services, which would support new jobs and worker households, some of whose incomes would be such that they would need affordable housing." *See also* https://www.seattle.gov/documents/departments/opcd/seattleplan/mha5yearevaluationberk2025.pdf, at 73 ("For example, a new market rate residential tower generates demand for new local serving businesses such as coffee shops, markets, and other services in the immediate area. This in turn creates a demand for additional lower-wage workers to staff these new businesses. These workers typically cannot afford market rents, and therefore need affordable housing.").

193.    That is not an "essential nexus."

194.    The City can never show that MHA-R shares an "essential nexus" with public impacts of any new housing development, for—as the City has admitted—additional housing of all kinds moderates housing costs, including the cost of rents. For this very reason, the City has upzoned portions of Seattle, resulting in the construction of additional housing in Seattle.

195.    Indeed, no one adding housing to Seattle is "substantially impeding" any low-income person from accessing housing in Seattle.

**COMPLAINT** - 24

196. Because the City can never show that MHA-R shares an "essential nexus" with impact mitigation, MHA-R's enforcement is unconstitutional in all cases, and certainly as applied to Plaintiffs.

197. Even if MHA-R could share an "essential nexus" with impact mitigation, the City would bear the burden of showing that its enforcement *also* reflects a "rough proportionality" to impact mitigation.

198. By "rough proportionality," the government must make an "individualized determination" that the nature and amount of its permit obligations reflects the likely impacts of the specific proposed development.

199. As the City has admitted, MHA-R's demand schedule is not designed to capture any negative impact of any project but, instead, is designed primarily to reflect the City's years-old estimate of the value of upzoning in the area.

200. That is, every time the City enforces MHA-R, the only "individualized determination" it makes concerns the City's years-old estimate of the value of upzoning in the new project's area, as well as the project's size.

201. Even if additional housing could (paradoxically) "substantially impede" a low-income person from accessing housing (*i.e.*, even if MHA-R could share an "essential nexus" with impact mitigation), there is no connection between that supposed impediment and the City's years-old estimate of the value of upzoning in the area.

202. Thus, the amount of MHA-R's demand is arbitrary in relation to impact mitigation. Accordingly, the City cannot show that MHA-R reflects a "rough proportionality" to impact mitigation, for any project to which it applies, and certainly not as applied to Plaintiffs.

203. Because the City can never show that the amount of MHA-R's demand reflects a "rough proportionality" with impact mitigation, MHA-R's enforcement is unconstitutional in all cases, and certainly as applied to Plaintiffs.

204. Accordingly, there is no set of circumstances where the City may constitutionally enforce the MHA-R permit condition.

**COMPLAINT** - 25

205.    Likewise, the MHA-R permit condition does not have any plainly legitimate sweep.

206.    The City's provisions establishing and calculating the MHA-R permit condition, SMC §§ 23.58C.005–.055, on their face and as applied to Plaintiffs, unconstitutionally burden the right to private property or its value not being taken without just compensation, as incorporated by the Due Process Clause of the Fourteenth Amendment.

207.    The City's enforcement of its provisions establishing and calculating the MHA-R permit condition, SMC §§ 23.58C.005–.055, on their face and as applied to Plaintiffs, amounts to an unconstitutional condition and/or *per se* taking of property or its value without compensation, in violation of the Fifth Amendment, as incorporated against the City by the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment.

208.    Plaintiffs are entitled to a declaration that MHA-R violates their rights under the Fifth Amendment as incorporated against the City by the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment to settle their rights and obligations with regard to MHA-R under federal law.

209.    Unless the MHA-R provisions set forth above are declared unconstitutional and permanently enjoined, Plaintiffs and others will continue to suffer great and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

A.    Compensatory damages to Plaintiffs Rocco Volker and Mehrit Teshome, amounting to $36,432.28 plus interest.

B.    Compensatory damages to Plaintiffs James Vert and 10.23 Build, LLC, amounting to $124,093.19 plus interest.

C.    $1.00 in nominal damages to each Plaintiff.

**COMPLAINT** - 26

INSTITUTE FOR JUSTICE
600 University Street, Suite 2710
Seattle, WA 98101
Tel: (206) 957-1300

D.    A declaratory judgment that, on its face and as applied to Plaintiffs, the provisions of Seattle Municipal Code §§ 23.58C.005–.055 violate the Fifth and Fourteenth Amendments to the U.S. Constitution.

E.    A permanent injunction prohibiting Defendant from enforcing Seattle Municipal Code §§ 23.58C.005–.055.

F.    Reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

G.    Such other legal or equitable relief as this Court may deem appropriate and just.

Dated: June 30, 2025                              Respectfully submitted,

Suranjan M. Sen (TN Bar No. 038830)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Phone: (703) 682-9320
Facsimile: (703) 682-9321
Email: ssen@ij.org

Paul V. Avelar (AZ Bar No. 023078)*
INSTITUTE FOR JUSTICE
398 South Mill Avenue, Suite 301
Tempe, Arizona 85281
Phone: (480) 557-8300
Facsimile: (480) 557-8300
Email: pavelar@ij.org

*pro hac vice application to be filed

s/ William R. Maurer
William R. Maurer (WSBA No. 25451)
INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, Washington 98101
Phone: (206) 957-1300
Facsimile: (206) 957-1301
Email: wmaurer@ij.org

**COMPLAINT** - 27